**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**TARA GIONFRIDDO, et al.**               *

   **Plaintiffs**               *

**v.**               *          **Case No.:  09-CV-1733**

**JASON ZINK, LLC, et al.**               *

   **Defendants**               *

  * * * * * * * * *

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS
MOTION FOR SUMMARY JUDMGENT AND OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

  Defendants, Jason Zink, LLC, JR Zink, Inc., and Mr. Jason Zink, by and through

undersigned counsel, submit this Memorandum in support of Defendants' Cross Motion for

Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment, and

for good cause states as follows:

**I.**  **Standard of Review**

  "When faced with cross-motions for summary judgment, the court must review each

motion separately on its own merits 'to determine whether either of the parties deserves

judgment as a matter of law.' " <u>Rossignol et al. v. Voorhar, et al.</u>, 316 F.3d 516, 523 (4th Cir.

2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (citation

and internal punctuation omitted)).  "When considering each individual motion, the court must

take care to 'resolve all factual disputes and any competing, rational inferences in the light most

favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal</u>

<u>Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996).

" '[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede no issues remain in the event his adversary's theory is adopted.' " Teksystems, Inc. v. Bolton, 2010 WL 447782, *4 (D. Md. Feb. 4, 2010) (Bennett, J.) (quoting Nafco Oil & Gas, Inc. v. Appleman, 380 F.2d 323, 325 (10th Cir. 1967) (alteration in original)).   There may always be a basic disagreement over what facts are material.   However, when cross motions for summary judgment demonstrate a basic agreement concerning what legal theories and materials facts are dispositive, the motions " 'may be probative of the non-existence of a factual dispute.' " Teksystems, supra (quoting Shook v. United States, 713 F.2d 662, 665).

"To effectuate the goals of the [Federal Fair Labor Standards Act, 29 U.S.C. 201 et seq. ("FLSA")], courts construe coverage under the FLSA 'liberally to apply to the furthest reaches consistent with congressional direction.' "   Shaliehsabou v. Hebrew Home of Greater Washington, Inc., 363 F.3d 299, 305 (4th Cir. 2004).   A question of statutory interpretation is a quintessential question of law.   United States v. Joshua, 607 F.3d 379, 382 (4th Cir. 2010). Courts begin with the "plain language" of the statute.   Id. (" 'When interpreting statutes we start with the plain language.' ") (quoting Stephens ex rel. R.E. v. Astrue, 565 F.3d 131, 137 (4th Cir. 2009)).   In interpreting the plain language of a statute, Courts give the words of a statute their " 'ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.' "   Id. (quoting DIRECTV, Inc. v. Nicholas, 403 F.3d 223, 225 (4th Cir. 2005).   "If the language is ambiguous, in that it lends itself to more than one reasonable interpretation," the Court's obligation "is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested."   Id. (quoting Newport News Shipbuilding &

Dry Dock Co. v. Brown, 376 F.3d 245, 248 (4th Cir. 2004)).

## II.      Statement of Undisputed Material Facts

This is an FLSA collective action case involving claims by four (4) bartenders and one (1) "Sous Chef."   The Plaintiffs performed work for one or both of the two restaurants ("taverns") known as "Don't Know Tavern" ("Don't Know") and "No Idea Tavern" ("No Idea") which were established by Mr. Jason Zink.   Don't Know and No Idea are located in the Federal Hill section of Baltimore, Maryland, which is a mixed residential/commercial neighborhood known throughout Baltimore for its restaurant and bar establishments, frequented by neighbors and young professionals.

It is undisputed that these establishments are operated by Mr. Jason Zink, a Defendant in this case.   It is also undisputed that he possesses management authority over the establishments.   But it is also undisputed that Mr. Zink also works as a bartender at both No Idea and Don't Know.   It is also undisputed that not a single Plaintiff has been able to testify as to their damages in this case.

### A.      Undisputed Material Facts Concerning The Plaintiffs

#### (i)      Tara Gionfriddo

Ms. Tara Gionfriddo is the lead Plaintiff of this FLSA collective action lawsuit.   Ms. Gionfriddo worked at Don't Know as a bartender.   As a bartender, Ms. Gionfriddo served and made drinks, served food, restocked liquors, restocked ice, rolled silverware, cleaned bathrooms, flipped chairs, and took the trash out.   (Exh. 1; Gionfriddo Depo. 8/12/2010, pg. 20).   Ms. Gionfriddo would bartend alongside other bartenders.   (Exh. 1; pg. 34).   Ms. Gionfriddo participated in a tip pool.   (Exh. 1; pg. 30).   The tip pool functioned by dividing the total amount of tips earned per shift by the total amount of hours worked by all bartenders (for

that particular shift), to determine an hourly rate.  (Exh. 1; pgs. 31-32).  The purpose of the tip pool was to average out earnings.  (Exh. 1; pg. 41).  Whatever bartender who wanted to divide and calculate the tip pool handled that assignment.  (Exh. 1; pg. 72).

It is undisputed that Mr. Zink bartended alongside other bartenders.  (Exh. 1; pg. 34).  According to Ms. Gionfriddo, Mr. Zink would be on the schedule to work as a bartender.  (Exh. 1; pg. 38).  She further claims that Mr. Zink participated in the tip pool, and that he shared in it just like any other bartender would share in it.  (Exh. 1; pg. 44).  Ms. Gionfriddo claims that Mr. Zink had a station at the bar in which he would work from, and if there were customers sitting at the bar, Zink would have a "full conversation with them."  (Exh. 1; pgs. 47-48).  According to Ms. Gionfriddo, Mr. Zink would serve drinks and customers would leave him tips.  (Exh. 1; pg. 68).  Ms. Gionfriddo does not claim that Mr. Zink stole tips from the tip pool.  (Exh. 1; pg. 75).

On average, Ms. Gionfriddo worked three or four days a week.  (Exh. 1; pgs. 24, 29).  She would mostly start her working shift at 5:00 pm.  (Exh. 1; pg. 29).  She does not believe that she ever worked any overtime.  (Exh. 1; pg. 42).  Ms. Gionfriddo claims that Mr. Zink bartended two or three times per week with her, but her claims are not specifically based on the work schedule and she admits that she has not calculated the number of times that Mr. Zink worked with her.  (Exh. 1; pgs. 44, 75 & Exh. 2 (schedule)).

Ms. Gionfriddo claims that Mr. Zink did not perform all of the duties of a bartender.  (Exh. 1; pgs. 45-46).  She claims that Mr. Zink would, while scheduled, go into the office or use his phone, but she could not identify how many times that occurred or when it occurred.  (Exh. 1; pgs. 48-49).  She claims that she complained to others that it was unfair that Mr. Zink could get away with not working as hard as she did.  (Exh. 1; pg. 54).

But even if Mr. Zink had fully performed all of the duties that she alleges he failed to perform, Ms. Gionfriddo claims that Mr. Zink should still not be entitled to retain any tips. (Exh. 1; pg. 88).  In other words, even if Mr. Zink had served more than half of all customers who leave tips for a two-person tip pool, Ms. Gionfriddo does not believe that Mr. Zink is entitled to any of the tips based on the service that he provides customers.  (Exh. 1; pg. 71). Again, this not a case where Ms. Gionfriddo claims that Mr. Zink stole tips or performed no services for the tips.  Rather, she believes that Mr. Zink cannot keep the tips that customers leave him, and that those tips should go to the other bartenders such as herself, because Mr. Zink owns the establishment and ostensibly receives the profits from the drinks/food being served.  (Exh. 1; pg. 70).  Ms. Gionfriddo claims that she has lost wages due to Mr. Zink's participation in the tip pool, because if he was not working as a bartender, she could have worked more shifts.  (Exh. 1; pg. 84).  If Mr. Zink had not been working, Ms. Gionfriddo or some other bartender would have been working.  (Exh. 1; pg. 97).

Ms. Gionfriddo claims that she is owed $7,000.00, but she cannot provide any explanation whatsoever as to the basis for that claim.  (Exh. 1; pgs. 85-87).  Ms. Gionfriddo does not know the number of hours that she worked, either.  (Exh. 1; pg. 88).

It is undisputed that Ms. Gionfriddo did not work at No Idea.  (Exh. 1; pg. 33).  Ms. Gionfriddo admits that she knows "nothing" about No Idea, and has no claims against it.  (Exh. 1; pg. 33).

### (ii)    Eric Gilbert

Mr. Eric Gilbert began working as a bartender at Don't Know in March of 2008 and ended his employment in approximately June of 2009.  (Exh. 3; Gilbert Dep. 8/13/2010, pg. 15).  According to Mr. Gilbert, he strictly worked at Don't Know, except for a single three hour

shift at No Idea.  (Exh. 3; pg. 15).  He started with two shifts per week, and it progressed to four to five shifts per week.  (Exh. 3; pgs. 19-20).

When Mr. Gilbert worked as a bartender, he participated in a tip pool.  (Exh. 3; pg. 26). The majority of the time, tips would be collected from the tip pool the same day of the shift. (Exh. 3; pgs. 26-27).  On occasion, Mr. Gilbert would calculate the tip pool.  (Exh. 3; pg. 27). Just as Ms. Gionfriddo described, the tip pool was calculated by totaling the amount of tips collected in a shift, with that number divided by the total number of bartender hours, with that resulting hourly rate multiplied by the actual number of hours each bartender actually worked. (Exh. 3; pgs. 27-28).  The tip pool could be calculated by whatever bartender was left in charge, or by Mr. Jason Zink.  (Exh. 3; pg. 29).  Mr. Gilbert has no claim that the identity of the closing bartender somehow favored or inured to the benefit of Mr. Jason Zink.  (Exh. 3; pgs. 31-32).

Mr. Gilbert does not deny that Mr. Zink worked as a bartender.  (Exh. 3; pg. 32).  Mr. Gilbert does not claim that Mr. Zink took tips from the tip pool and performed no work.  (Exh. 3; pg. 33).  Mr. Gilbert admits that Mr. Zink collected equal tips per the number of hours that Mr. Zink worked behind the bar.  (Exh. 3; pg. 76).  Mr. Gilbert just claims that Mr. Zink worked on a "smaller scale."  (Exh. 3; pg. 33).  For example, Mr. Gilbert claims that Mr. Zink only served drinks and that he performed no other work incidental to bartending, or that for the majority of his time, Mr. Zink would just serve drinks and entertain the female patrons.  (Exh. 3; pgs. 35-36, 45).  However, Mr. Gilbert cannot deny the fact that Mr. Zink interacted with customers as a "host" (though he claims some interactions between Mr. Zink and customers left customers "uncomfortable"), and that there is such an occupation known as a head bartender. (Exh. 3; pgs. 36).

Mr. Gilbert acknowledges that there is a responsibility of bartenders to socialize, and further acknowledges that he was on first name basis with patrons and that he had a neighborhood reputation as a good bartender.  (Exh. 3; pgs. 38-39).

Like Ms. Gionfriddo, Mr. Gilbert is short on specifics when it comes to what he seeks from this lawsuit.  Mr. Gilbert admits that he does "have a specific number" in terms of the damages he is seeking.  (Exh. 3; pg. 58).  Mr. Gilbert has no number in mind with respect to the number of times that Mr. Zink worked as a bartender, with or without him being scheduled at the same time.  (Exh. 3; pgs. 32-33).  Mr. Gilbert admits that he does not know the total amount of hours for which he seeks compensation.  (Exh. 3; pg. 59).  However, the relief he seeks from this lawsuit is for Mr. Zink to disgorge the tips that Mr. Zink received.  (Exh. 3; pgs 60-64).  While Mr. Gilbert admits that "[i]t's not like [Mr. Zink] tipped himself out and wasn't even there," he believes that Mr. Zink only did 30 percent of the work, and therefore should give back 70 percent of the tips that Mr. Zink received.  (Exh. 3; pg. 62).  And while Mr. Gilbert admits that if he was handling work incidental to serving customers, the tips that Mr. Zink was receiving from customers were still going into the tip pool.  (Exh. 3; pg. 75).

### (iii)    Aaron Zetzer

Mr. Aaron Zetzer first began working as a bartender at No Idea in June 2007, and then moved over to Don't Know and worked through June 2008.  (Exh. 4; Zetzer Depo. 8/13/2010, pgs. 18, 21).  Mr. Zetzer worked one or two days during the week and then on the weekend at No Idea (Saturday night and Sunday brunch).  (Exh. 4; pg. 28-29).  According to Mr. Zetzer, there was only a "small period" in which Mr. Zetzer worked at both bars.  (Exh. 4; pg. 31).  Mr. Zetzer does not know whether his hours were added together when he worked at both establishments.  (Exh. 4; pg. 32).  Shifts would run between 5:00 pm and 2:00 am, and there

was a tip pool at both No Idea and Don't Know.  (Exh. 4; pgs. 35-36).  According to Mr. Zetzer, whatever tips were acquired throughout a shift were divided up evenly by the bartenders, taking into account the number of hours worked.  (Exh. 4; pg. 36).  The tip pool was managed by "collective agreement," and it was broken down into an hourly wage.  (Exh. 4; pg. 39).  If there was only one bartender working, all the tips were the property of that bartender. (Exh. 4; pg. 42).

Mr. Zetzer also claims that Mr. Zink worked as a bartender.   (Exh. 4; pg. 43). According to Mr. Zetzer, Mr. Zink did not work every week with him at Don't Know.  (Exh. 4; pgs. 43-44).  Rather, Mr. Zink would as a bartender at Don't Know for larger events and holidays, like New Year's Halloween, and St. Patricks' Day.  (Exh. 4; pg. 43).  At No Idea, Mr. Zink worked with Mr. Zetzer "perhaps a few times," "[m]aybe five times tops."  (Exh. 4; pg. 44).  Mr. Zetzer could not recall how many times that Mr. Zink worked with him at Don't Know, but estimated that it "[m]aybe closer to ten times I guess."  (Exh. 4; pgs. 44-45).

Mr. Zetzer acknowledges that a bartender's responsibilities include serving customers, making sure that everyone is happy, and selling as much food and alcohol as possible.  (Exh. 4; pg. 41).  Mr. Zetzer recalls that Mr. Zink would be "entertaining friends that he knew were regulars, or buying shots, or buying drinks for friends and regulars."  (Exh. 4; pg. 46).  All bartenders would have their own work stations and would work out of that area.  Id.  Like the other Plaintiffs, Mr. Zetzer acknowledges that a bartender's job is not just to pour drinks, but to keep people relatively entertained.  (Exh. 4; pgs. 49-50).  It is the ultimate responsibility of a bartender to promote a bar, and when Mr. Zetzer worked as a bartender, he attempted to draw people to the bar.  (Exh. 4; pgs. 49-51).  Mr. Zetzer admits that when Mr. Zink was entertaining others and "buying shots," he was still promoting his establishment.  (Exh. 4; pg. 51).

According to Mr. Zetzer, the more promotional work that is done, the larger the crowd, and the greater the tips.  (Exh. 4; pg. 52).

Like Ms. Gionfriddo and Mr. Gilbert, Mr. Zetzer is critical of Mr. Zink's work ethic, claiming that Mr. Zink did not work at the same intensity of the other employees, and that he was more "hosting the party."  (Exh. 4; pg. 52).  But Mr. Zetzer admits that Mr. Zink performed work, but claims that he just did not pour as many drinks as the other bartenders and didn't have the same "hustle."[1]  (Exh. 4; pgs. 53, 55).  Mr. Zetzer does admit that some guests/patrons at Don't Know would stop in just to visit Mr. Zink, and when Mr. Zink worked, he did perform the duties of a bartender and that he would manage the crowd.  (Exh. 4; pgs. 93-94).

And like Ms. Gionfriddo and Mr. Gilbert, Mr. Zetzer also believes that it would be fair if he and others receive the tips that customers left for Mr. Zink.  (Exh. 4; pg. 57).  But unlike Ms. Gionfriddo and Mr. Gilbert, Mr. Zetzer at least admits that such a practice would enrich the bartenders.  (Exh. 4; pg. 58).

Mr. Zetzer is also short on the specific damages he seeks.  He cannot identify the damages that he is claiming in this lawsuit.  (Exh. 4; pg. 64).  Mr. Zetzer cannot identify the hours that he seeks compensation, and does not even have an estimate.  (Exh. 4; pg.95).  (At the same time, he admits that it is fair for Mr. Zink to know exactly how much he is demanding in the lawsuit.).  (Exh. 4; pg. 96).  Mr. Zetzer does not believe that Mr. Zink was unfair to him at No Idea.  (Exh. 4; pg. 61).  Mr. Zetzer, like Ms. Gionfriddo and Mr. Gilbert, considers the measure of damages to be the return of the tips that Mr. Zink received.  (Exh. 4; pg. 65).

---

[1]     These are remarkable statements, given the fact that Mr. Zetzer's employment terminated in 2008 and only worked with Mr. Zink a total of 15 shifts.  In any event, Mr. Zetzer admits that Mr. Zink worked hard, as "[y]ou have to work hard to own a restaurant or a bar."  (Exh. 4; pg. 54).

However, Mr. Zetzer admits that customers left Mr. Zink tips, and it was possible that they left Mr. Zink more tips than they left him.  (Exh. 4; pg. 67).

### (iv)   Brian Emar

Brian Emar filed an opt-in consent notice to join this case on February 19, 2010, but was never added to the Complaint.  Mr. Emar worked at No Idea from September 2006 through "pretty much" December 2007.[2]  (Exh. 5; Emar Depo. 8/12/2010, pgs. 11-12).  When Don't Know opened in May of 2007, Mr. Emar "predominately" worked at Don't Know and only worked at No Idea "occasionally."  He claims that he worked full time between the two establishments, and that his combined hours "averaged between 40 to the lower 50s."  (Exh. 5; pgs. 12-13).  When Don't Know opened, Mr. Emar kept one shift per week at No Idea, i.e., the brunch shift during college football season.  (Exh. 5; pg. 14).

As a bartender, Mr. Emar took care of guests, made drinks, rang in food orders, set up the bar and closed it down.  (Exh. 5; pg. 15).  Mr. Emar testified that only "occasionally" and "periodically" did Mr. Zink work as a bartender at either No Idea or Don't Know.  (Exh. 5; pg. 16).

When Mr. Emar worked at No Idea, he received no hourly pay and worked strictly for tips.  (Exh. 5; pgs. 17-18).  Mr. Emar denies that he offered to work just for tips.  (Exh. 5; pg. 26).  Mr. Emar claims that he never received an hourly wage, even after he started at Don't Know.  (Exh. 5; pg. 27).

Mr. Emar cannot estimate the amount of hours that he was not compensated and does not know the total damages that he is seeking.  (Exh. 5; pgs. 27-28).  Mr. Emar believes that his

---

[2]      Mr. Emar denies being fired in January 2007 and not working from January 2007 through May 2007.  (Exh. 5; pgs. 34-35).

damage might be $11,000 or $12,000, but he "could be wrong." (Exh. 5; pg. 32). While he claims that he has added up the minimum wage for all the hours that he worked, he has "no idea" what that total might be. (Exh. 5; pg. 33).

### (v)    Astrid Garrison

Ms. Astrid Garrison's claims are totally unlike the claims of the other Plaintiffs, as she was not a bartender but rather the "Sous Chef." She worked from August 2008 through June of 2009. (Exh. 6; Garrison Depo. 8/12/2010, pg. 47). She admits that she was not part of any tip pool, and her claims have nothing to do with the validity of the tip pool. (Exh. 6; pg. 19). She did not work at No Idea, and she has no claims arising out of any employment with No Idea. (Exh. 6; pg. 41). She simply prepared and cooked food for Don't Know, and she never worked as a bartender.[3] (Exh. 6; pgs. 30, 37).

Ms. Garrison was paid by check and in cash for her work. (Exh. 6; pg. 18). Ms. Garrison has no idea how much cash she received, and incredibly claims ignorance as to the purpose of the payment. (Exh. 6; pgs. 26, 45). Ms. Garrison was paid overtime if she worked over 80 hours a week. (Exh. 6; pg. 41). Ms. Garrison claims that the hours on her paycheck do not match the hours that she worked, but she cannot testify as to the number of hours missing or the amount of damages that she is claiming. (Exh. 6; pgs. 38-39). In her own words, she testified: "… I am not paying a whole lot of attention to legal terms."). (Exh. 6; pg. 39)

### B.    Undisputed Material Facts Concerning The Defendants

#### (i)    Establishments

According to the Plaintiffs, Don't Know is a full service restaurant, with appetizers, salads, entrees, side orders, specials, and deserts. (Exh. 6; pg. 40). You can go to Don't Know

---

[3]     Ms. Garrison did, however, witness Mr. Zink working as a bartender. (Exh. 6; pg. 38).

and just have dinner and not drink.  (Exh.6; pgs. 40-41).  Plaintiff Eric Gilbert described Don't Know as a "high volume restaurant" with "good food."  (Exh. 3; pg. 20).

In contrast, No Idea "was basically the opposite of Don't Know," as it was "smaller, more intimate, more laid back.  Don't Know was geared more toward the restaurant, and No Idea was geared towards a bar."  (Exh. 3; pgs. 20-21).

No Idea does business as JR Zink, Inc. and Don't Know does business under Jason Zink, LLC.  (Exh. 7; Aff. Jason Zink ¶ 2).  Don't Know was established in May of 2007.  (Exh. 7; Aff. Jason Zink ¶ 3).  Don't Know has a General Manager, Steve Gronowski, who is responsible for all of the business that is transacted at Don't Know.  (Exh. 7; Aff. Jason Zink ¶ 4).  Steve Gronowski has no general involvement with No Idea.  (Exh. 7; Aff. Jason Zink ¶ 5).  Both establishments have different menu offerings, are located on opposite ends of Federal Hill, and cater to different clientele.  (Exh. 7; Aff. Jason Zink ¶ 6).  While both establishments follow certain sports teams, the sports teams that each establishment follows are different.  (Exh. 7; Aff. Jason Zink ¶ 7).  The finances of these establishments are separately maintained.  (Exh. 7; Aff. Jason Zink ¶ 8).  In very rare instances, an individual may work at both establishments concurrently or successively.  Payroll is to be maintained separately.  (Exh. 7; Aff. Jason Zink ¶ 9).

Don't Know had gross sales in excess of $500,000.00 for the calendar year of 2008, but had gross sales of $282,679.00 in 2007.  (Exh. 8).  On the other hand, No Idea has never had gross sales in excess of $500,000.00.  In 2006, No Idea had gross sales of $315,079.00.  (Exh. 9).  In 2007, No Idea had gross sales of $461,581.00.  (Exh. 10).  In 2008, No Idea had gross sales of $395,020.00.  (Exh. 11).  In 2009, No Idea had gross sales of $335,885.00.  (Exh. 12).

**(ii)      Jason Zink**

It is correct that Mr. Jason Zink is the owner of the outstanding stock of JR Zink, Inc. and is the sole member of Jason Zink, LLC.  (Exh. 7; Aff. Jason Zink ¶ 10).  While he has retained a General Manager to handle the day-to-day affairs of Jason Zink, LLC (Don't Know), Mr. Zink generally supervises and controls both Don't Know and No Idea.  Mr. Jason Zink is not an absentee owner or an investor.  (Exh. 7; Aff. Jason Zink ¶ 11).  He works on site, and contributes to the functioning of both establishments.  (Exh. 7; Aff. Jason Zink ¶ 12).

Mr. Zink works as a bartender at both No Idea and Don't Know (although he principally works as a bartender at No Idea).  (Exh. 7; Aff. Jason Zink ¶ 13).  He receives no less than $30.00 in tips per month, directly from customers when he works as a bartender.  (Exh. 7; Aff. Jason Zink ¶ 14).  Mr. Zink participates in the tip pool like other bartenders, in the exact same manner as other bartenders.  (Exh. 7; Aff. Jason Zink ¶ 15).  Mr. Zink does not take a greater percentage of tips from the tip pool, or contribute less to the tip pool than other bartenders.  (Exh. 7; Aff. Jason Zink ¶ 16).  Mr. Zink performs the same services and functions of any other bartender.  (Exh. 7; Aff. Jason Zink ¶ 17).  He covers a certain area of the bar, just like other bartenders.  (Exh. 7; Aff. Jason Zink ¶ 18).  As a bartender, Mr. Zink works to promote the establishments by engaging patrons and building local relationships.  (Exh. 7; Aff. Jason Zink ¶ 19).  When he works as a bartender, the duties that he performs are in essence that of a "head bartender," although he has not assigned himself that specific job title.  (Exh. 7; Aff. Jason Zink ¶ 20).

Prior to opening these establishments, Mr. Zink worked as a bartender in various cities throughout the United States.  (Exh. 7; Aff. Jason Zink ¶ 21).  He has no particular formal education in business management, human resources, or the law.  (Exh. 7; Aff. Jason Zink ¶

22).  It was his understanding owners of a restaurant/bar could participate in a tip pool, as he has seen this occur in other establishments.  (Exh. 7; Aff. Jason Zink ¶ 23).  Prior to this lawsuit, he has never been sued by any employee nor has any employee ever made any demands against him, of any kind.  (Exh. 7; Aff. Jason Zink ¶ 24).  In addition, Mr. Zink has never been audited by the U.S. Department of Labor or Maryland Department of Labor, Licensing & Regulation.  (Exh. 7; Aff. Jason Zink ¶ 25).  When Mr. Zink requested information from the website "Just Answers," he had no understanding whatsoever that his participation in the tip pool, when he actually performed the duties of a bartender, could be called into question. (Exh. 7; Aff. Jason Zink ¶ 26).

Mr. Zink has received K-1 statements from the establishments, but he has also received W-2 statements issued to employees.  (Exh. 13).

## III.    Argument

The Defendants' arguments in favor of summary judgment, and arguments in opposition to Plaintiffs' motion for summary judgment, are set forth below.

### A.    Defendants' Motion for Summary Judgment

Unlike Plaintiffs' "partial" Motion for Summary Judgment, Defendants' Motion for Summary Judgment can dispose of this case in its entirety.  As set forth below, Defendants argue: (1) Brian Emar was not properly joined to this lawsuit, and even if he was, his claims are barred by the statute of limitations; (2) there is no jurisdictional coverage under the FLSA to extend to claims against JR Zink, Inc. (d/b/a "No Idea"); (3) the tip pool practices of the Defendants were valid under the FLSA, as it is undisputed that Mr. Zink work "in an occupation" in which he received tips from customers; (4) in the alternative, even if the tip pool practices were illegal, the measure of damages is the time each bartender spent working with

Mr. Zink; (5) none of the Defendants are able to testify as to their damages, and accordingly, their prima facie case fails; (6) there is no evidence that the Defendants willfully violated the FLSA (to the contrary, the undisputed evidence is that Mr. Zink was caught by surprise by these FLSA allegations); and (7) assuming that this Court entertained the remaining Maryland law claims, these supplemental claims are without merit for the various reasons set forth *infra*.

> **1.     Brian Emar Is Not Properly Joined To This Lawsuit And the Court Must Strike His Consent.**

The Plaintiffs count Mr. Brian Emar among their ranks, but he has not been added as a party Plaintiff in this case, and as a result, his consent must be striken from the record.

It is undisputed that an opt-in notice was filed on behalf of Mr. Brian Emar on February 19, 2010.  (Doc. 23).  No amended complaint has been filed naming Mr. Brian Emar as a party Plaintiff.

However, cases in this district and others demonstrate that it is not sufficient to just file an opt-in consent notice in order to become a Plaintiff in an FLSA case.  See, e.g., Lopez et al. v. NTI, LLC, et al., DKC 08-1579, 2008 WL 5120542, *4 (D. Md. Dec. 4, 2008).  In Becker v. Southern Soils, et al., 2006 WL 3359687, *1 (M.D. Fla. Nov. 20, 2006), the District Court observed: "[t]he filing of a consent to join in the [FLSA] litigation does not operate as an automatic joinder in the action or amendment of the complaint.  Rather, the consent filed pursuant to 29 U.S.C. § 216(b) must be read in conjunction with Fed.R.Civ.P. 8."  Becker, 2006 WL 3359687, at *1.  As the Court in Harkins v. Riverboat Services, Inc., 2002 WL 32406581, *5 (N.D. Ill. May 17, 2002) has explained:

> "Section 216(b) is phrased in the negative, i.e., no individual may be a party plaintiff to a collective action unless he or she files a written consent with the court; the act of filing a written consent alone does not automatically join an individual to the lawsuit.  Rather, Section 216(b) operates in conjunction with Rule 8 of the Federal Rules of Civil Procedure and requires the employee to name the individual plaintiff and allege his or

her cause of action in the complaint and that the individual must file a written consent with the Court.

Harkins, 2002 WL 32406581 at *5.

As the Court in Canfield v. U.S., 14 Cl. Ct. 687 (1988) observed, there are practical reasons why opt-in Plaintiffs must be added to a Complaint, such as judicial management and the fact that "[i]f a bare notice of consent filing was sufficient to allow the joinder of plaintiffs, defend would have no meaningful opportunity to oppose the continued addition of plaintiffs who might not be 'similarly situated.' " Canfield, 14 Cl. Ct. at 691.  The Canfield Court also observed that the Court would be without discretion to run on the addition of opt-in persons. Id.  "Requiring plaintiffs to file new complaints and seek consolidation, to file motions to intervene, or to ask the court to waive its normal joinder rules, forces them-at the earliest possible time – to make a showing that the additional proposed plaintiffs are indeed 'similarly situated.' " Id.  As the Court in Bartels v. Sperti, Inc., 73 F.Supp. 751, 757 (S.D.N.Y. 1947) stated, "[t]he present inconvenience of retyping the document would seem to be less than the inconvenience to the court and to counsel at the trial, at which time a search must necessarily be made through a variety of miscellaneous stipulations and orders to find the title to the action and the names of the parties.  It is no mere technicality to require some semblance of order in a judicial proceeding and it seems little enough to require of plaintiffs that they serve and file a complaint which shall show the title of the action with the names of the parties, together with such formal allegations as may connect them with the claim for relief." Bartels, 73 F.Supp. at 757.

As the Complaint has not been amended to name Mr. Brian Emar as a Plaintiff, the Defendants request that the Court strike Mr. Emar's consent (Doc. 23) from the record and dismiss all reference of him from this case, without prejudice.

2.      **In The Alternative, Brian Emar's Claims Are Barred By The Statute of Limitations.**

Assuming arguendo that this Court will allow Brian Emar to continue as a "Plaintiff" in this case, his FLSA claims are barred by the statute of limitations.[4]

The statute of limitations for an FLSA violation is two years from the date the cause of action accrued, "and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]" 29 U.S.C. § 255(a).

The issue, then, is when Mr. Emar's claims "commenced" against the Defendants. "[T]he date an action is commenced under the FLSA depends on whether it was instituted as a collective action.  Non-collective actions are deemed 'commenced' for purposes of an individual claimant's statute of limitations when the complaint is filed on behalf of that claimant.  However, an FLSA collective action is not 'commenced' for purpose of a named plaintiff's limitations period until *both* of these occur: (1) a complaint is filed specifically naming the individual as a plaintiff; and (2) a written consent to suit is filed with the court by that plaintiff."  Thomas et al. v. Talyst, Inc., No. C07-202JLR, 2008 WL 570806, *2 (W.D. Wash. Feb. 28, 2008) (citing 29 U.S.C. § 256; Gray v. Swanney-McDonald, Inc., 436 F.2d 652-654-55 (9th Cir. 1971); Bonilla v. Las Vegas Cigar Co., 61 F.Supp.2d 1129, 1132-33 (D. Nev. 1999)); see also Kuhn et al. v. Philadelphia Electric Co., 487 F.Supp. 974, 975 (E.D. Pa. 1980)

---

[4]      The consent filed by Mr. Brian Emar indicates no other purpose other than to join this case and assert his FLSA rights.  He has not joined the lawsuit and pled any another claims, e.g., Maryland supplemental law claims.

("Courts which have considered 29 U.S.C. § 256 have distilled from it two basic prerequisites for the commencement of a § 216(b) suit:  a complaint must be filed, and the claimant must file his or her individual consent.").

Here, it is obvious from the Complaint and docket that this case was filed as a collective action.  Accordingly, Mr. Brian Emar's statutory "look back period" begins on February 19, 2010, when he filed his opt-in consent form.  (Doc. 23).  As a result, he can only recover wages from February 19, 2008 through February 19, 2010.[5]

But Mr. Emar's claims do not fit within this period, and thus suffer from a fatal defect: he admits that he worked from September 2006 through "pretty much" December 2007.  (Exh. 5; pgs. 11-12.  Therefore, Mr. Emar's FLSA claims "commenced" more than two years after his employment was terminated and as a result, are statutorily barred.

Because Mr. Emar opted into this lawsuit more than two years after his employment terminated, any claim by Mr. Emar – assuming he was properly joined to this case – must fail as a matter of law.[6]

### 3. FLSA Coverage Is Lacking Over Defendant JR Zink, Inc. And There Exists No Evidence That JR Zink, Inc. and Jason Zink, LLC Operated A "Single Enterprise" Under The FLSA.

As set forth in a recent FLSA case involving restaurants, "[a] Plaintiff wishing to invoke the protections offered by the FLSA must satisfy the requirements for either individual **or**

---

[5]    As set forth in greater detail, Section 7, infra, the Plaintiffs cannot establish evidence that any FLSA violations in this case are willful within the meaning of the FLSA.  For much of the time, Mr. Emar worked only one restaurant, No Idea.  As explained below, No Idea has never been covered by the FLSA based on its annual gross sales being less than $500,000.00.  Accordingly, the Defendants would have had no basis to consider their actions in relation to the FLSA.

[6]    Likewise, and as further explained in Section 7, infra, Summary Judgment may be entered against all other claims brought by the other Plaintiffs prior to July 1, 2007 (the other Plaintiffs filed their lawsuit and consents on July 1, 2009).  This defense would only impact part of Mr. Aaron Zetzer's claims.

enterprise coverage." <u>Diaz v. Jaguar Restaurant Group, LLC</u>, 649 F.Supp.2d 1343, 1346 (S.D. Fla. 2009) (emphasis added); <u>see also</u> <u>Russell v. Continental Restaurant, Inc.</u>, 430 F.Supp.2d 521 (D. Md. 2006) (examining the alternative basis for FLSA jurisdiction, i.e., individual and enterprise coverage).   Plaintiffs have pled no facts in support of their allegations of FLSA coverage, but merely conclude that both individual and enterprises jurisdiction exists.  (Doc. 26, ¶ 5).

As far as individual coverage is concerned, Judge Williams of this District Court in <u>Russell</u>, <u>supra</u>, rejected arguments by a restaurant server that she was an employee "engaged in commerce or in the production of goods." <u>Russell</u>, 430 F.Supp.2d at 526.  Judge Williams cited a Department of Labor regulation and opinion letter, and noted that it was "clear that communications with vendors and processing of credit card payments do not bring Plaintiff's claim within the ambit of the FLSA." <u>Id.</u> at 525.  Accordingly, while the Plaintiffs have cited no facts in support of this allegation, whatever arguments that they might make fail as a matter of law.

With respect to enterprise coverage, "[e]nterprise coverage exists where the enterprise as a whole is 'engaged in commerce or in the production of goods for commerce." <u>Diaz</u>, 649 F.Supp.2d at 1346.  As part of its definition of enterprise coverage, the enterprise must have an annual gross volume of sales of not less than $500,000.00.  29 U.S.C. § 203(s)(1)(A)(ii).

It is undisputed in this case that JR Zink, Inc. (d/b/a No Idea) has **<u>never</u>** had this level of sales.  (Exhs. 8-12).  This is true through 2009.  (Exh. 12).  Accordingly, the claims by Mr. Aaaron Zetzer (or Mr. Brian Emar, a putative Plaintiff), must be dismissed to the extent that they originate out employment based in No Idea.

Perhaps sensing that jurisdiction is lacking over No Idea, Plaintiffs raise the issue in

their Motion for Partial Summary Judgment that the "Zink Businesses were Plaintiffs' Joint Employers." (Doc. 45-1, pgs. 6-7). They further add, in a footnote, that "these companies collectively must be considered one 'enterprise' for FLSA purposes," alleging – without evidentiary support - that it was paying employees of both bars through the payroll of one company. (Doc. 45-1, pg. 6 n. 6). But this claim is itself undercut by Plaintiffs' statement that "Zetzer worked at both bars owned by Zink Businesses and received paychecks from Jason Zink, LLC and JR Zink, Inc." (Doc. 45-1, pg. 7 (citing Exh. 4 to Doc. 45).

Leaving aside the very significant issue that the Plaintiffs have never pled that the JR Zink, Inc. and Jason Zink, LLC constitute a single enterprise or a joint employer (a claim which is therefore waived), the Plaintiffs are very disingenuous to claim that payroll for Don't Know was being by another entity owned by Jason Zink – it was not. The deposition transcript cited by the Plaintiffs contains questioning of why an entity known as "Jason Zink, Inc." was on a tax return when Jason Zink, LLC is the entity which operates Don't Know. It is beyond any dispute that the reference to Jason Zink, Inc. was just a typographical error by the accountants for Jason Zink, LLC. Plaintiffs have produced no evidence of any entity known as "Jason Zink, Inc.," and in a telephone hearing, voluntarily withdrew their claims against any such entity. (Doc 35). Because the Plaintiffs cite no facts in support of a joint employment liability, that theory must be rejected.

In any event, "[w]hether two companies constitute a single enterprise for FLSA coverage and whether they are liable as joint employers under § 207 are technically separate issues." Chao v. A-One Medical Serv., Inc., 346 F.3d 908, 917 (9th Cir. 2003); see also Kaplun v. Lipton, 2007 WL 707383, at *3 (S.D. Fla. Mar. 5, 2007) ("[A] finding of enterprise coverage does not necessarily compel a finding of joint liability under the FLSA.").

To determine whether multiple corporations constitute a single enterprise, Courts examine multiple factors. As the Fourth Circuit has observed:

> Under the [FLSA], a single enterprise consists of 'related activities performed (either through unified operation or common control) by any person or persons for a common business purpose ... whether performed in one or more establishments or by one or more corporate or other organizational units... .' 29 U.S.C. § 203(r). To summarize: The statute states that for an enterprise to be a 'single enterprise' under the Act it must conduct (1) related activities, (2) performed under unified operations or common control, and (3) for a common business purpose.

Brock v. Hamad, 867 F.2d 804, 806 (4th Cir. 1989); see also Yeibyo et al. v. E-Park of DC, Inc., Civ. No. DKC 2007-1919, 2008 WL 182502, *6 (D. Md. Jan. 18, 2008).

With respect to related activities, the Plaintiffs themselves admit that there are substantial differences between Don't Know and No Idea. (Exh. 3; pgs. 20-21). Plaintiff Eric Gilbert described them as opposites, with Don't Know geared towards being a restaurant and No Idea geared towards being a bar. Id. This case is unlike any of the FLSA restaurant cases in which multiple corporations have been found to consist of a single enterprise. See, e.g., Chao v. Barbeque Ventures, LLC, 2007 WL 5971772 (D. Neb. Dec. 12, 2007); Morgan v. Speakeasy, LLC, 625 F.Supp.2d 632 (N.D. Ill. 2007).

In Barbeque Ventures, LLC, a number of corporations operated five "Famous Dave's" restaurants selling barbeque food. Id. at *4. As a result, the "related activities" factor was satisfied. Id. In Morgan, two corporate entities operated two distinct restaurants. Id. at 636. the Morgan Court found the "related activities" factor satisfied based on evidence that the restaurants "considered themselves to be 'sister operations.' " Id. at 647.

In Cabral v. Lakes Café Sports Bar & Grill, Inc., 2010 WL 1372457, *4 (S.D. Fla. Mar. 31, 2010), another FLSA case involving whether multiple restaurants could be characterized as a single enterprise, the District Court observed that evidence of "related activities" involve

"centralized office function, centralized warehousing or regularly shared employees."   <u>Id.</u>
Here, like in <u>Cabral</u>, there is absolutely no evidence of a centralized office function.   While the
District Court in <u>Cabral</u> determined that the restaurants there shared an employee, there was
evidence of raw materials being supplied from one restaurant to another and that food prepared
at one restaurant was prepared at another.   <u>Id.</u> at *4.   According to <u>Cabral</u>, such evidence was
sufficient to establish a material dispute of fact.   <u>Id.</u>

But here, the only issue is whether No Idea and Don't Know have "regularly shared
employees."   <u>Cabral</u>, <u>supra</u>.   Clearly, Plaintiff Tara Gionfriddo and Astrid Garrison worked
only at Don't Know and there claims have nothing to do with No Idea.   (Exh. 1; pg. 33; Exh. 6;
pg. 41).   With respect to Plaintiff Eric Gilbert, he exclusively worked at Don't Know, and only
worked at No Idea for a three hour shift.   (Exh. 3; pg. 15).   Likewise, there was only a "small
period" when Plaintiff Aaaron Zetzer worked for Don't Know and No Idea.   (Exh. 4; pg. 31).
Similarly, Brian Emar claims that once Don't Know opened in May 2007, he "predominantly"
worked at Don't Know and only worked at No Idea "occasionally," such as the weekend brunch
shift at No Idea during college football season.   (Exh. 5; pgs. 11-12, 14).

This is simply insufficient evidence to establish that these two entities "regularly shared
employees" and were engaged in "related activities."   Plaintiffs barely pay any attention to this
issue, relegating their analysis to a footnote.   (Doc. 45-1, pg. 6).   On this record, there is no
evidence that the entities were "sister operations," like <u>Morgan</u>, <u>supra</u>, and they certainly did
not operate under the same tradename like <u>Barbeque Ventures</u>, <u>supra</u>.   Accordingly, this
element is not satisfied.

The evidence in support of the remaining elements, i.e., "unified operation or common
control" and "common business purpose," is likewise insufficient.   In <u>Barbeque Ventures</u>, the

Court stressed that the restaurants were all overseen by the same Area Director and manager. <u>Barbeque Ventures</u>, 2007 WL 5971772 at *5.  In <u>Cabral</u>, the Court observed that "to establish a 'unified operation,' Plaintiff must present evidence of a relationship where the two entities 'are in effect a single business unit or an organized business system which is an economic unit directed to the accomplishment of a common business purpose.' " <u>Cabral</u>, 2010 WL 1372457 at *4 (citation omitted).  "Factors to examine include intermingling funds, obtaining separate liability and worker's compensation insurance, ordering supplies separately, interchanging employees and operating with the same managers." <u>Id.</u>

Here, Don't Know is completely managed by Steve Gronowski whereas No Idea is managed by Defendant Jason Zink.  Mr. Zink does not have day-to-day involvement in Don't Know.  Not only is the management separate, there is no evidence that the two businesses share the same bank accounts, maintain a single insurance policy, and order supplies together. Accordingly, this factor does not support a finding of enterprise coverage.

Finally, the corporate Defendants lack a "common business purpose."  A "[c]ommon business purpose exists when 'a corporation is formed to carry out a particular business objective, all the activities in furtherance thereof which it may perform through unified operation or common control will, in economic reality, be related and for a common business purpose… .' " <u>Barbeque Ventures</u>, 2007 WL 5971772 at *5 (citation omitted).  There must be something " '[m]ore than a common goal to make a profit.' " <u>Cabral</u>, 2010 WL 1372457 at *5. Here, Don't Know and No Idea do not further each other interests.  If anything, they compete against each other for restaurant and bar patrons.  Moreover, there is no evidence that the profits of Don't Know and No Idea were intermingled.   According to <u>Cabral</u>, there must be intermingling of profits or there is no common business purpose. <u>Cabral</u>, <u>supra</u> (citing cases).

In summary, it is undisputed that the Plaintiffs have failed to present satisfactory evidence that the sales of Don't Know and No Idea can be combined to constitute a single enterprise under the FLSA.  As a result, all claims against No Idea, which has always earned less than $500,000.00 per year must be dismissed for lack of subject matter jurisdiction.  In addition, all claims against Don't Know must be dismissed for lack of subject matter jurisdiction as it is undisputed that Don't Know earned less than $500,000.00 for 2007.  (Exh. 8).  The only claims remaining in this case involve FLSA claims against Don't Know from 2008 through the conclusion of each employee's employment.[7]

### 4.   Defendants Did Not Violate The Tip Pool, As Defendant Zink Is "Engaged In An Occupation" Which Receives Tips.

It is undisputed that Defendant Jason Zink only received tips from the tip pool when he worked as a bartender.  For purposes herein, the Defendants will concede that Defendant Zink satisfies the definition of "employer" under 29 U.S.C. § 203(d),[8] but contend that he also satisfies the definition of "tipped employee" under 29 U.S.C. § 203(t).

The starting point, in any legal analysis under the FLSA, is the statute itself.  While the FLSA is to be liberally construed, it may only be so construed "consistent with congressional direction."  Shaliehsabou v. Hebrew Home of Greater Washington, Inc., 363 F.3d 299, 305 (4th Cir. 2004).  The applicable provisions of the FLSA are 29 U.S.C. § 203(m), expressly permits tip pools "among employees who customarily and regularly receive tips."  29 U.S.C. § 203(m).

---

[7]       At this point, Mr. Brian Emar has no claim and Plaintiff Aaaron Zetzer's claim has been cut in half (as he worked from June 2007 through June 2008 (Exh. 4, pg. 21).

[8]       The Defendants do not concede that the Maryland Wage Payment and Collection Law (MWPCL), Md. Ann. Code LE art. 3-501 et seq., provides for individual liability.  See Watkins v. Brown, 173 F.Supp.2d 409, 414-16 (D. Md. 2001).  Therefore, Defendants oppose any claim that Mr. Zink can be held individually liable under the MWPCL.

According to the FLSA, a "tipped employee" "means any employee *engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.*"  29 U.S.C. § 203(t) (italics added).

The language, context, and history of the FLSA with respect to payment of the minimum wage to tipped employees compels a conclusion that Defendants did not violate the tip pool provision of 29 U.S.C. § 203(m).  "Originally, the FLSA did not address tips, and employers often required employees to surrender tips to their employers."  Fast v. Applebee's Intern., Inc., 2010 WL 816639, *4 (W.D. Miss. Mar. 4, 2010).  As observed in Kearns, et al., FAIR LABOR STANDARDS ACT, pg. 549 (BNA 1999):

> "As first enacted, the FLSA had no provisions that dealt with tips or tipped employees. Many employers, analyzing nonstatutory employment issues under contract law principles, undertook to meet their newly imposed FLSA obligations with regard to tipped employees by 'agreeing' with those employees that they – the employees – would surrender all or part of their tips to the employer.  As much of the surrendered tip money as the employer needed to meet the minimum wage could then be returned to the employee in fulfillment of the employer's statutory obligation."

Kearns et al., THE FAIR LABOR STANDARDS ACT, pg. 549 (BNA 1999) (citing Williams v. Jacksonville Terminal Co., 315 U.S. 386 (1942)).  The Supreme Court in Jacksonville Terminal approved these arrangements, until Congress intervened to regulate the so-called "hourly wage method" for computing wages of a tipped employee who relinquished all tips to the employer.  Id. at pgs. 550-51.  Beginning with the 1966 Amendments to the FLSA, Congress allowed an employer to take a credit for tips of up to 50 percent of the applicable minimum wage.  Id. at 550.  In 1974, Congress amended Section 3(m), limiting it to "tipped employees" and added the provision at issue in this case - that all tips must be retained by the employee except in the case of a valid tip pooling arrangement, which was valid if the tip pool was "among employees who customarily and regularly receive tips."  Id. at 551 (quoting 29

U.S.C. § 203(m)).

The essential problem with Plaintiffs' lawsuit claiming an invalid tip pool, is that its major premise is that Defendant Jason Zink cannot be an "employer" for purposes of 29 U.S.C. § 203(d), and both a "tipped employee" for purposes of 29 U.S.C. § 203(t).  Despite their apparent best efforts, the Plaintiffs have cited absolutely no case to establish this premise – they have just assumed that an individual must be one or the other.

But Courts commonly recognize that an individual may be both an "employee" and an "employer" under the FSLA.  See, e.g., Dole v. Simpson, 784 F.Supp. 538, 544-45 & n.4 (S.D. Ind. 1991) (Observing that "[t]he FLSA statutory definition of an 'employer' is a sui generous concept, not bound by tests provided by the common law" and noting "an employee may be named as a defendant in an individual capacity under the broad definition of 'employer' in the Act.").  Moreover, it should be noted that the Supreme Court has held that the FLSA "defines the verb 'employ' expansively," and thus "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992); see also Brock v. Superior Care, Inc., 840 F.2d 1054, 1058 (2d Cir.1988).  The FLSA's definition of employee has been called the " 'broadest definition that has ever been included in any one act.' " United States v. Rosenwasser, 323 U.S. 360 n.3 (1945) (quoting 81 Cong.Rec. 7,657 (1938) (statement of Sen. Black)).  To accept Plaintiffs' argument that an individual with supervisory control can only be an employer – and cannot also be an employee - would be to carve out of the FLSA's protections a huge group of individuals who also use their labors on behalf of the employing organization.  Yet, supervisors are often viewed as exempt employees – not exempt employers.

Once we accept the fact that Defendant Jason Zink can *potentially* be both an

"employer" and a "tipped employee" under the FLSA, the question is whether Defendant Zink satisfies the definition of "tipped employee" by virtue of his work.

"Generally, when confronted with the question of which employees constitute 'tipped employees' under the FLSA, courts … have focused their analysis on the level of customer interaction the specific employees in question had, as opposed to the amount of customer interaction experienced by the occupation as a whole." Wajcman v. Investment Corp. of Palm Beach, 2009 WL 465071, *3 (S.D. Fla. Feb. 23, 2009); see also Roussell v. Brinker Intern., Inc., 2008 WL 2714079, *10 (S.D. Tex. July 8, 2008) ("The Court agrees with the Sixth Circuit that the level of customer interaction is highly relevant to the question of whether an employee may participate in a valid tip pool.").

There is no textual prohibition in the FLSA, prohibiting an individual defined as an "employer" under § 203(d) from also being defined as a "tipped employee" under § 203(t). Roussell, 2008 WL 2714079 at *6 ("Neither the language of the FLSA nor the relevant regulations provide much clear guidance regarding which employees or occupations may participate in mandatory tip pools or tip sharing arrangements.")  In construing the relevant sections of FLSA, §§ 203(m) & (t), the Court must first consider the plain meaning of the language to the extent possible.  Caminetti v. U.S., 242 U.S. 470 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms.").  The Court must remain cognizant of its responsibility to employ common sense in interpreting statutory language, meaning that refusing to appreciate the social goals of the legislation, or the problem the statute was intended to address, would inappropriately ignore and defeat the spirit of these laws. See Bob Jones Univ. v. U.S., 461 U.S. 574, 586 (1983)

(discussing the importance, in certain situations, of considering the purpose of the statute).

It is undisputed that Defendant Jason Zink only participated in the tip pool when he served as a bartender.  It is likewise undisputed that Defendant Jason Zink received tips (i.e., more than $30 a month), (Exh. 1; pg. 68), and that he regularly interacted with customers. (Exh. 1; pgs. 47-48 (claiming Zink would have full conversations with customers when working as a bartender).  Plaintiff Aaron Zetzer even admits that some guests/patrons at Don't Know would stop in just to visit Mr. Zink, and when Mr. Zink worked, he did perform the duties of a bartender and that he would manage the crowd.  (Exh. 4; pgs. 93-94).  In fact, while Plaintiffs criticize Defendant Zink's bartending skills, they cannot deny that he acted much like the host of the party, and like other bartenders, promoted the establishment while serving as a bartender.  (Exh. 3; pgs. 36; Exh. 4; pg. 51).  He received a W-2 for his work as an employee. (Exh.13).

It is also undisputed that this is **not** a case of Defendant Zink performing no work and taking tips from the tip pool.  (Exh. 3; pgs. 33, 62 ("Gilbert admitted that [i]t's not like [Mr. Zink] tipped himself out and wasn't even there"); Exh. 1; pg. 75 (Ms. Gionfriddo does not claim that Mr. Zink stole tips from the tip pool).  Plaintiff Eric Gilbert admits that Mr. Zink collected equal tips per the number of hours that Mr. Zink worked behind the bar.  (Exh. 3; pg. 76).  Aaron Zetzer testified that he did not believe that Mr. Zink treated him unfairly.  (Exh. 4; pg. 61). The Plaintiffs just claim that it is unfair because they claim Mr. Zink did not have the same level of "hustle" as they did, (Exh. 4; pgs. 53, 55), or that they could have picked up extra shifts if Mr. Zink was not scheduled to work.  (Exh. 1; pg. 84).

Simply put, this is not the type of evil to which the FLSA was enacted to prevent.  The 1974 Amendment to the FLSA was designed to prevent employers from using the "hourly wage

method" in which an employer would use relinquished tips to satisfy its minimum wage

obligations.  Bob Jones Univ., supra.  There is no suggestion anywhere in this case that

Defendant Zink was using forfeited tips to pay the minimum wage.  In all of the work that he

performed, including his work as a bartender at No Idea or Don't Know, he was "engaged in an

occupation" in which he received from customers more than $30 a month in tips.  29 U.S.C. §

203(t).  Section 203(t) certainly does not textually limit an employer from doing the work of a

tipped employee, and by necessary implication, an employer who performs the duties of a

tipped employee can participate in a tip pool.

Plaintiffs complain about Mr. Zink's bartending skills and level of "hustle" (ignoring

their own reasons why their employment was terminated), but it is immaterial: Mr. Zink served

as a bartender and received tips from customers.  This is a material fact not in dispute.  From

the patron's perspective, Mr. Zink was a "tipped employee" even though he operates the

establishment.  Wajcman, 2009 WL 465071 at *3 (finding industry custom from a patron's

perspective is relevant, and observing that the language of § 203(t) "suggests that industry

norms are an important consideration in determining which employees are properly included in

a tip pool under the FLSA.").  There is nothing in the legislative history compelling the

conclusion that Congress passed § 203(m) to prevent small business owners, such as Mr. Zink,

from working alongside other tipped employees in tipped occupations.  To the contrary, Mr.

Zink was "engaged in an occupation" in which he received tips, i.e., he is the head

bartender/owner of Don't Know and No Idea.  Accordingly, there has been no violation of §

203(m) and Plaintiffs are owed nothing.  Kilgore v. Outback Steakhouse of Florida, 160 F.3d

294, 301 (6th Cir. 1998) ("if a tip-pool participating employee fulfills the subsection of 203(t)

requirements, [he] necessarily fulfills the subsection 203(m) requirements as well.").

The Plaintiffs' analysis of this subject is not comprehensive and its citations are not on point or easily distinguishable.  Plaintiffs initially cite 29 C.F.R. § 531.35 as support, but that regulation only requires that the minimum wage be paid "free and clear," and it does not have anything to do with tipped pools or tipped employees, per se.  This case has no allegations of impermissible deductions for employer expenses, no money has been kicked back to the employer, and this citation is completely off-point.  See Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, (5th Cir. 1973).

The Plaintiffs also cite Chung v. New Silver Palace Restaurant, Inc., 246 F.Supp.2d 220 (S.D.N.Y. 2002), but this case is also distinguishable.  In Chung, all tips received by group of waiters were pooled and were shared between waiters, busboys, and "black jackets."  Id. at 222. (So, on its face, this case does not involve an owner also working as a waiter).  There was a long history of labor (union/management) strife at the restaurant (the Court noted that the restaurants had been involved in "almost continuous labor strife since 1995"), as management had demanded in negotiations that black jackets receive a greater percentage of the tip pool.  Id. at 221-22. Allegations were made that management's proposal violated New York state law as well as allegations that the restaurant was not negotiating in good faith pursuant to the National Labor Relations Act (NLRA).  Id. at 223.  Before the New York Supreme Court was able to issue an injunction and the National Labor Relations Board issue an order, the restaurant filed bankruptcy and shortly thereafter, the owners of the restaurant reopened.  Id.  The rulings of the New York Supreme Court and National Labor Relations Board (NLRB) were ignored, a waiter who objected to the practices was fired, another was fired for not signing a petition in favor of the tip sharing, and management created a rival union and otherwise threatened the waiters with business closure.  Id.

Not surprisingly, subsequent proceedings were filed by the NLRB and the new restaurant filed for bankruptcy. Id. at 225-26. The Chung proceedings were initiated in the U.S. District Court against individual defendants, so the bankruptcy stay did not apply. Id. at 222, 226. Given this tortuous background in which Defendants would seek to evade judicial and administrative rulings, judicial sympathy for the Defendants' case was hardly present. The Defendants in Chung argued that the "black jackets" performed "traditional service functions," but the Court – in its only rationale in finding the practice to violate § 203(m), stated: "defendants cannot ascribe to 'tradition' that which has been adjudged to be illegal, and the practice of forced sharing of tips with management is such an illegal practice regardless whether or not the members of management were engaged in restaurant services that could be the subject of tipping." Id. at 229. Critically important and interwoven within the Chung decision was that the practice clearly violated the text of New York law (New York law being textually more specific than the FLSA). The Chung Court appeared to embrace the same mistaken analysis that the Plaintiffs' proffer to this Court: that an individual is either an employer or a tipped employee, but cannot be either. The Court was clearly frustrated with the defendant/employer's antics, which included orders from the New York Supreme Court and NLRB, and repeatedly filing for bankruptcy protection. The Chung decision and results turn heavily on New York state law, which is clearly not applicable here. Finally, Chung relies on Ayres v. 127 Restaurant Corp., 12 F.Supp.2d 305 (S.D.N.Y. 1988), where a tip pool was violated by including a General Manager in the tip pool. Ayres, 12 F.Supp.2d at 308-09. But in Ayres, it was undisputed that that the General Manager was not an employee who customarily and regularly received tips. Id. at 308.

Obviously, this case is different. Mr. Zink worked alongside and with the other

bartenders, as a bartender.  Unlike Ayres, whenever Mr. Zink received tips from the tip pool it was for his work as a bartender; a bartender who "customarily and regularly received tips."

Plaintiffs state that "Chung is not an outlier case but represents the reasoned opinions of other Courts that have considered this issue… ."  (Doc 45-1, pg. 15).  Plaintiffs cite Davis v. B&S, Inc., 38 F.Supp.2d 707 (N.D. Ind. 1998), yet this case provides no safe passage for their illogical claims but rather supports the Defendants.  In Davis, a disk jockey (DJ) brought an FLSA suit, claiming that the tip pool was invalid because it required him to share his tips with the General Manager.  Id. at 709.  Apparently, the General Manager's duties including serving as an assistant to the DJs, operating stage lights, and setting up music routines for the adult entertainers.  Id. at 710.  While the Davis Court could not definitely conclude that the General Manager was an employer, for purposes of the FLSA, it did observe that the General Manager was acting in his own interests, and in the interests of his employer, when he accepted and retained tips from customers and participated in the tip pool.  Id. at 716-17.  The Court denied summary judgment to the employee, "because issues of fact remain as to whether [the General Manager] was a 'tipped employee' with regard to his work with the disc jockeys, the validity of his participation in the tip pool with [the plaintiff] under § 203(m) cannot be resolved as a matter of law."  Id. at 717.

Here, even if we conclude that Mr. Zink may be defined as an employer, the undisputed facts demonstrate that Mr. Zink was acting in his own interests when he worked as a bartender and participated in the tip pool.  By working as a bartender, he was simply trying to earn income to support himself – just like the Plaintiffs.  To the extent relevant to this analysis, the Davis case cited by Plaintiffs actually supports, not hurts, the Defendants' position.

Plaintiffs argue that Mr. Zink cannot be an owner and a tipped employee, but merely

rest their argument on conclusions rather than convincing statutory analysis and the legislative history it rests upon.  They poke fun at the fact that Mr. Zink posted a question on a legal website (Doc. 45-1, pg. 16), but that is irrelevant to whether he can be defined under the FLSA as both a "tipped employee" and an "employer."  Moreover, the fact that the General Manager of Don't Know Tavern, Steve Gronowski, does not participate in the tip pool is likewise irrelevant.  As an initial matter, Mr. Gronowski does not work as, and is not scheduled to work as a bartender – a fact that Plaintiffs ignore.  Moreover, even if Mr. Gronowski did perform the duties of a bartender, absolutely consistency is not necessary and one can still conclude that Mr. Zink is "engaged in an occupation" in which he receives tips from customers, i.e., a tipped employee.  Finally, Plaintiffs **admit** that the amount of work performed by Mr. Zink as a bartender is immaterial (Doc. 45-1, pg. 17 n.11), and quarrel over the fact that Mr. Zink did not have to clock in or out, did not have to pay for his meals, and otherwise was not treated "as an employee."  But being treated similarly is not the test for whether an employee is a "tipped employee" for purposes of 29 U.S.C. § 203(t).

The economic and social problem that Section 3(m) was intended to address was the practice of forcing tips to be relinquished to an employer, who would then turn and pay the employee the minimum wage from the collected tips.  This is not the issue here.  It would be inconsistent with congressional direction, Shaliehsabou, supra, for this Court to extend the FLSA in a manner which would unfairly punish the Defendants and enrich the Plaintiffs.  The sole inquiry is whether or not Mr. Zink was "engaged in an occupation" in which he received tips.  Because it is undisputed that Mr. Zink worked as a bartender and received tips and interacted with patrons, Summary Judgment must be granted to the Defendants.  Because the

claims of the bartender Plaintiffs rise or fall on this issue,[9] this Court must dismiss with prejudice the FLSA claims (Count I) of Plaintiffs Gionfriddo, Zetzer, Gilbert, and Emar (assuming the Court denies Defendants' other defenses to Emar's participation).

> **5.** **Plaintiffs' Fail To Present A Prima Facie FLSA Case, As None Of Them Can Testify As To Their Damages.**

The Plaintiffs have the burden of establishing the hours that they claim that they have worked and the work for which they claim to have performed and were not paid.  McLaughlin v. Murphy, 436 F.Supp.2d 732, 737 (D. Md. 2005) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946) and Turner v. Human Genome Science, Inc., 292 F.Supp.2d 738, 748 (D. Md. 2003)).

"Often, the [FLSA] plaintiff can prove his or her 'under-compensation' damages through discovery and analysis of the employer's code-mandated records.  However, if the employer kept inaccurate or inadequate records, the plaintiff's burden of proof is relaxed, and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage estimate."  Myers v. Cooper Cellar Corp., 192 F.3d 546, 551 (6th Cir. 1999) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946)).  In other words, if records are produced, an employee must prove damages with specificity by the use of the available records, and the option of proving damages inferentially is unavailable.  Id.

---

[9]     Plaintiffs, perhaps sensing that their claims are without merit, make an alternative claim – for the very first time – that Section 3(m) was violated because they were not informed that Defendants were taking a "tip credit."  (Doc. 45-1, pg. 17).  But this argument was not even pled and appears as a throw-in.  Defendants would be prejudiced by the Court's consideration of this argument as no discovery has been directed toward any such claim.  Because it is not set forth in the pleadings, it has been waived and the Court must disregard it.

      **i.      Records Were Maintained For Plaintiffs Garrison, Gionfriddo, and Gilbert Yet They Still Do Not Know Their Damages.**

In this case, there are employer maintained records from which Plaintiffs Garrison, Gionfriddo and Gilbert could testify as to their damages allegedly owed to them. (Exh. 2). In fact, Plaintiffs were busy attaching some of those time records in Doc. 45, Exh. 8.

However, each of these Plaintiffs were totally unable to testify regarding their damages. For example, Plaintiff Tara Gionfriddo claims that she is owed $7,000.00, but she cannot provide any explanation whatsoever as to the basis for that claim. (Exh. 1; pgs. 85-87). Ms. Gionfriddo does not know the number of hours that she worked, either. (Exh. 1; pg. 88). It is unclear whether Ms. Gionfriddo's $7,000.00 claim is based on her claim that she has lost wages due to Mr. Zink's participation in the tip pool, because if he was not working as a bartender, she could have worked more shifts. (Exh. 1; pg. 84). If Mr. Zink had not been working, Ms. Gionfriddo or some other bartender would have been working. (Exh. 1; pg. 97). But this fact is irrelevant, as the FLSA does not recognize payment for work that could have been performed if the employee had been allowed to work additional shifts.

Like Plaintiff Tara Gionfriddo, Plaintiff Eric Gilbert could not identify his damages. Mr. Gilbert admits that he does "have a specific number" in terms of the damages he is seeking. (Exh. 3; pg. 58). Mr. Gilbert has no number in mind with respect to the number of times that Mr. Zink worked as a bartender, with or without him being scheduled at the same time. (Exh. 3; pgs. 32-33). Mr. Gilbert admits that he does not know the total amount of hours for which he seeks compensation. (Exh. 3; pg. 59). However, he claims that what he wants out of this lawsuit is for Mr. Zink to disgorge the tips that Mr. Zink received. (Exh. 3; pgs 60-64). But again, like Ms. Gionfriddo's desire to recover additional money for the lost opportunity to work

additional shifts, this sort of relief is not recognized under the FLSA.

Contrary to Plaintiffs' claims that Plaintiff Astrid Garrison received no overtime (Doc. 45-1, pgs. 11-12), Ms. Garrison admits that she was paid overtime if she worked over 80 hours a week.  (Exh. 6; pg. 41).  Ms. Garrison claims that the hours on her paycheck do not match the hours that she worked, but she cannot testify as to the number of hours missing or the amount of damages that she is claiming.  (Exh. 6; pgs. 38-39).  In her own words, she testified:  "… I am not paying a whole lot of attention to legal terms.").  (Exh. 6; pg. 39)

Simply put, these Plaintiffs have not even *alleged* any damages with the sort of specificity required under the law.  Even if the Court was going to give the Plaintiffs a pass, and allow them to testify inferentially as to their damages (a practice which is not recognized when records are available, as in this case), the testimony of the Plaintiffs is entirely lacking.  It is not even an estimate – it is nothing.   In McLaughlin, supra, Judge Blake granted summary judgment in a case where records *were unavailable*, in which an employee provided far more information about his unpaid hours than these Plaintiffs, yet Judge Blake held that the Plaintiff in McLaughlin had failed to meet his burden of showing uncompensated hours as a "just and reasonable inference."  McLaughlin, 436 F.Supp.2d at 738 (citing Jax Beer Co. v. Redfern, 124 F.2d 172, 175 (5th Cir. 1941) (refusing to base an award upon the "guess, speculation, and averages made up from the uncertain recollections of these appellees.").   Here, and unlike McLaughlin, there are records and therefore, the Plaintiffs had the obligation to review the records, calculate their damages, and be prepared to testify as to them.

Because the Plaintiffs have failed to make a proper showing with specificity, they have failed to meet their burden going forward and their claims (Counts I, II, III, IV, V, VI, VII & VIII) must fail as a matter of law.  Myers, 192 F.3d at 551 (affirming dismissal of FLSA claims

in a tip pooling case where employer possessed precise records from which plaintiffs could have determined their damages).

### ii.        Zetzer Cannot Identify His Damage Even By Inference.

The Defendants did not maintain records when they first opened, and therefore, Mr. Zetzer can potentially testify under the relaxed standards of <u>Mt. Clemens Pottery</u>, <u>supra</u>. However, he is also short on the specific damages he seeks.  He cannot identify the damages that he is claiming in this lawsuit.  (Exh. 4; pg. 64).  Mr. Zetzer cannot identify the hours that he seeks compensation, and does not even have an estimate.  (Exh. 4; pg.95).  (He even admits that it is fair for Mr. Zink to know exactly how much he is demanding in the lawsuit.).  (Exh. 4; pg. 96).  Mr. Zetzer does not believe that Mr. Zink was unfair to him at No Idea.  (Exh. 4; pg. 61). Like Ms. Gionfriddo and Mr. Gilbert, Mr. Zetzer also believes that it would be fair if he and others receives the tips that customers left for Mr. Zink.  (Exh. 4; pg. 57).  Mr. Zetzer, like Ms. Gionfriddo and Mr. Gilbert, considers the measure of damages to be the return of the tips that Mr. Zink received, even though he admits that customers may have left Mr. Zink more tips than they left him.  (Exh. 4; pgs. 65, 67).  But this is clearly not recoverable under the FLSA, and to his credit, Mr. Zetzer at least admits that such a practice would enrich the bartenders.  (Exh. 4; pg. 58).

While records were not precisely maintained for all periods involving Mr. Zetzer's employment, his case cannot proceed because it fails for the reasons set forth above, Mr. Zetzer fails to identify – even by just and reasonable inference – the amount of damages which he claims in this case.

### iii.       If The Tip Pool Was Invalid, The Measure of Damages Are The Hours When Each Plaintiff Worked With Jason Zink.

Assuming arguendo that the tip pool was invalid, and that the Plaintiffs have presented a

prima facie case of an FLSA violation, Defendants seek at least partial summary judgment on the proper measure of damages in this case.  In <u>Myers v. Copper Cellar Corp.</u>, 192 F.3d 546, 550-51 (6th Cir. 1999), a group of wait staff alleged that their employer maintained an invalid tip pool as it compelled the inclusion of "salad makers" within the tip pool.  <u>Id.</u> at 548.  The Sixth Circuit affirmed a lower Court's ruling that the salad makers were not "tipped employees" and therefore, the tip pool was invalid.  <u>Id.</u> at 550 (reasoning, in large part, that the salad preparers abstained from direct contact with dinners and performed duties traditionally associated with food preparation).  The Sixth Circuit further held:

> "[D]uring the work shifts in which salad mixers were included within the tip pool, the pooling scheme was illegal; thus each employee who was compelled to contribute to such a tip pool was statutorily entitled to payment of the full $4.25 per hour minimum wage for all work time logged *during those shifts*."

> <u>Myers</u>, 192 F.3d at 551 (italics added).

Accordingly, and as a matter of law and logic, the Plaintiff bartenders who are claiming an invalid tip pool arrangement (i.e., Gionfriddo, Gilbert & Zetzer) are limited in terms of any recovery to the shifts that they worked with Mr. Zink.  They cannot simply claim the full minimum wage for every hour that they ever worked.  Defendants request that the Court enter partial summary judgment as to this proper measure of damages.

### 6.    All Maryland Law Claims Fail As A Matter of Law.

The Court, having declined jurisdiction over No Idea and/or finding no FLSA violations committed by the Defendants, should dismiss the supplemental state law claims.

In the event that the Court seeks to retain jurisdiction, all conceivable Maryland law claims fail as a matter of law, for the following reasons:

###### i.    Maryland Wage/Hour Law Exempts Restaurants From Overtime.

Maryland Wage/Hour law does not allow any of the Plaintiffs to recover unpaid overtime.  See Md. Ann. Code LE art. 3-415(b)(3).  Accordingly, Summary Judgment should be entered on any such claim (Doc. 26, Counts VI & VII).

###### ii.    Maryland Wage/Hour Law Does Not Prohibit Management From Participating In A Tip Pool Arrangement.

Unlike the FLSA, Maryland Wage/Hour law does not provide any limitation on who may participate in a tip pool.  Cf. Md. Ann. Code LE art. 3-419(a)(2) ("this section does not prohibit the pooling of tips") with 29 U.S.C. § 203(m) ("… except this subsection shall not be construed to prohibit the pooling of tips *among employees who customarily and regularly receive tips*.") (italics added).  Accordingly, even if the Court was to find that Defendant Jason Zink could not have participated in the tip pool under the FLSA, there is no similar restriction under Maryland Wage/Hour law, and Summary Judgment should be entered on Count II of Plaintiffs' First Amended Complaint (Doc. 26, Count II).

###### iii.    Maryland's Wage Payment Collection Law Cannot Be Applied To Recover Tips Received By Defendant Jason Zink.

Although they admit that Defendant Jason Zink performed bartending duties, the Plaintiffs seek treble damages based on the tips that Mr. Zink received.  This claim fails as a matter of law because the term "wage" is limited to compensation promised for service.  Md. Ann. Code LE art. § 3-501(c)(1) & (2).  As it is axiomatic that tips are provided by customers and not an employer, the Plaintiffs cannot claim that the Defendants promised them any amount of tips for their service, and then unlawfully withheld the same.  Summary Judgment should be entered on Count III of Plaintiffs' First Amended Complaint (Doc. 26, Count III).

Moreover, even if tips were wages under Maryland's Wage Payment and Collection

Law, Plaintiffs' claim that the Defendants deducted these tips fails as it is clear that the Plaintiffs allege a § 3-503 violation yet Courts have ruled that no private cause of action lies under § 3-507.1 to recover deductions illegally withheld under § 3-503.  Rao v. Net Equity Financial, Inc., et al., JFM 09-2752 (unpublished Letter Order; Doc. 20 (attached)) ("Section 3-507.1 permits private actions by individual employees only for violations of Section 3-502 and 3-505 of the MWPCL.  The necessary implication is that a private action for alleged violations of Section 3-503 cannot be brought under Section 3-507.1.") (citing cases).

Because Count III of Plaintiffs' First Amended Complaint clearly seeks relief under § 3-503 (Doc. 26, ¶ 30), Summary Judgment is proper for this reason, as well.

### iv.    The Tort of Conversion Fails To State A Cause of Action.

In Count VIII of Plaintiffs' First Amended Complaint, the Plaintiff bartenders allege that the Defendants committed the tort of conversion by diverting "a portion of the 'tip pool' to provide improper compensation to the owner, a non-tipped individual, at the Bartender Plaintiffs' expense."  (Doc. 26, ¶ 50).

First, this claim is directly premised on upon Plaintiffs' FLSA claims.  Accordingly, this claim is preempted as a matter of law by the FLSA.  Morgan v. Speakeasy, LLC, 625 F.Supp.2d 632, 658-60 (N.D. Ill. 2007) (in identical circumstances, where tip pool was allegedly invalid under the FLSA, the District Court dismissed a claim of unjust enrichment, reasoning, in part, that the employee would have to establish a violation of the FLSA in order to pursue a claim for unjustment enrichment).

Second, "[a]s a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds." Darcar Motors of Silver Spring v. Borzym, 841 Md. 828, 834 n.3 (2004) (citing cases).

Because the Plaintiffs cannot claim that the tips were "specific segregated or identifiable funds" (they were, of course, money pooled between Mr. Zink and the other bartenders), the Plaintiffs' claim for conversation (Count VIII) fails as a matter of law.

> **7.  Plaintiffs Have No Evidence That Defendants Willfully Violated The FLSA.**

Actions for alleged violations of the FLSA's minimum wage provisions "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a)

Thus, the limitations period governing Plaintiffs' claims is dependent on whether any alleged violation by the Defendants can be considered "willful" within the meaning of the FLSA.  As there is no evidence to support a finding that that the Defendants acted in willful violation of the FLSA, the FLSA's two year limitations period must, as a matter of law, be applied to this action.

The meaning of the term "willful" for purposes of the FLSA's statute of limitations was addressed by the Supreme Court in McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988). Richland Shoe held that in order for a willful violation to be established, it must be shown by the plaintiff "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.  Id. at 133.  In so holding, Richland Shoe noted that an alternative standard used by some courts, which conditioned the issue of willfulness on whether or not the employer recognized the FLSA to be "in the picture," did not reflect congressional intent with regard to defining liability under the Act.  Id. at 134 n.12.

The Richland Shoe standard has since been repeatedly applied within the Fourth Circuit. See, e.g., Chao v. Self Pride, Inc., 232 Fed. Appx. 280, 286-87 (4th Cir. 2007) (citing Richland

<u>Shoe</u> for the proposition that a willful violation will only be found "if (1) the defendant is reckless or deliberate with regard to determining its obligations under the FLSA").  <u>Self Pride</u> went on to confirm that an "actually malignant" mental state on the part of the employer was a predicate condition to finding a willful violation.  <u>Id.</u> at 287.  The standard of willfulness is high:  Generally speaking, evidence of willfulness can include evidence that an employer has previously been investigated for FLSA violations or that there is evidence of a scheme to cover up FLSA violations.  <u>Williams v. Maryland Office Relocators</u>, 485 F.Supp.2d 616, 621 (D. Md. 2007) (citing cases).  Other Courts, outside of the Fourth Circuit, have observed that "a violation of the [FLSA] is willful where undisputed evidence showed that the employer 'had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA.' "  <u>Herman v. Palo Group Foster Home, Inc.</u>, 183 F.3d 468, 474 (6th Cir. 1999) (<u>quoting</u> <u>Dole v. Elliott Travel & Tours, Inc.</u>, 942 F.2d 962, 967 (6th Cir. 1991).

      Given the high standard for willfulness, any violation of the FLSA which may have occurred in this case cannot, as a matter of law, be found willful.  With respect to the tip pool, there is no evidence that Defendant Jason Zink had any idea that an owner who also works as a bartender in his own establishment would violate the FLSA.  He had never been investigated by the Department of Labor or had been previously sued for minimum wage or overtime violations.  According to Mr. Zink, it is common practice among small bars and restaurants for owners who work as bartenders to participate in the tip pool to the same extent and manner as any other tipped employee.  With respect to the claims from No Idea, there is no basis to believe that Mr. Zink understood that the revenues of two otherwise separate corporate enterprises could be *potentially* added together to obtain FLSA coverage.  Mr. Zink is young

entrepreneur who could have reasonably believed that his two small restaurants were simply not subject to Federal Wage/Hour laws.  Finally, Mr. Zink and his General Manager paid Astrid Garrison overtime, but only after 80 hours in a week, a mistake which to wage/hour lawyers is obvious but to small business persons is not as obvious.

The fact that Mr. Zink wrote to a legal website to request advice demonstrates, conclusively, that he did not have a guilty state of mind.  If he knew he was violating the FLSA by participating in the tip pool, why write to a legal website to inquire about the practice?  Even after the filing of this lawsuit, Mr. Zink was obviously surprised by the counter-intuitive nature of the FLSA.

Accordingly, the Plaintiffs cannot demonstrate that Mr. Zink willfully violated the FLSA, assuming that they can demonstrate any FLSA violation whatsoever and satisfy their burden of proof in order to move forward.  Therefore, the statute of limitations for *potential* FLSA claims for Plaintiffs Gionfriddo, Gilbert, Zetzer, Garrison is July 1, 2007 through July 1, 2009, and for the potential opt-in Plaintiff Emar, from February 19, 2008 through February 19, 2010.

### 8.  Opposition to Plaintiffs' Partial Motion for Summary Judgment.

The arguments set forth above dispose of this entire case.  In the event that the Court denies some or all of this Motion, the Defendants write briefly to respond to Plaintiffs' Partial Motion for Summary Judgment.[10]

---

[10]     The Plaintiffs' filed a Motion for Leave to File a Second Amended Complaint.  This Court has not ruled on this contested Motion.  The Plaintiffs have also partly based their partial Motion for Summary Judgment on a new count added into their Second Amended Complaint.  The Defendants do not believe that they have any obligation to fully respond to these arguments until such time as the Court rules on whether the Second Amended Complaint may be filed.

i.  **Defendant Zink Was Not Plaintiffs' Employer Under The Maryland Wage Payment and Collection Law.**

The Defendants concede that at the close of discovery, that there is enough evidence to establish, as a matter of law, that Defendant Zink was Plaintiffs' employer under the FLSA and Maryland's Wage/Hour law, Md. Ann. Code LE art. 3-401 *et seq*.

However, and not withstanding the unpublished decisions cited by the Plaintiffs, the well-researched, reasoned, and published decision of this Court in <u>Watkins v. Brown</u>, 173 F.Supp.2d 409, 414-16 (D. Md. 2001) clearly demonstrates that individuals who perform supervisory functions cannot be held liable under the Maryland Wage Payment and Collection Law, Md. Ann. Code § 3-501 *et seq*.  <u>Watkins</u>, 173 F.Supp.2d at 414-16.  Accordingly, partial summary judgment on this issue should be denied.

ii.  **Emar's Claim For Not Being Paid The Minimum Wage Must Fail As It Was Not Pled.**

Assuming the Court will allow Mr. Brian Emar to proceed as a Plaintiff, surely the Court will not allow him to proceed in a collective action under a different set of facts than the other bartender Plaintiffs.

The crux of this case is that the bartender Plaintiffs were denied the minimum wage because they were subjected to an invalid tip pool arrangement.

The Plaintiffs offer up an alternative basis to award Mr. Emar the minimum wage, i.e., that he was not paid it all (but there is tension in their argument because they admit that he was paid something as reflected in his IRS Form W-2).

In any event, this claim has not been pled in the First Amended Complaint (Doc. 26), and is therefore waived.  This is yet an additional reason to rule against Mr. Emar.

### iii.    Garrison's Claim Under The MWPCL Fails As It Was Not Pled.

For the same reasons as set forth above for Mr. Emar, Ms. Garrison did not pled her MWPCL claim in the Plaintiff's First Amended Complaint.   (Doc. 26).   In addition, Ms. Garrison admits receiving excess cash in addition to her a check representing her wages.   As observed above, Ms. Garrison cannot identify her damages under the MWPCL.

This claim was deemed waived by omitting it from the First Amended Complaint, and also fails for lack of proof.

### iv.    Plaintiffs Cannot Rely On Unauthenticated Documents and Interrogatories To Establish The Amount Of The Wage Violations.

The Plaintiffs rely on Brian Emar's Answers to Interrogatories (Doc. 45-1, Exh. 5), but it is axiomatic that a party cannot rely on its own answers to interrogatories as admissible evidence.  See, e.g., Gilmore v. Macy's Retail Holdings, 2009 WL 140518, *9 (D. N.J. Jan. 20, 2009) (citing cases).  In addition, there is a material dispute of fact concerning Mr. Emar's calculation of damages (as set forth in his Interrogatories), as Jason Zink swears in his affidavit that he terminated Brian Emar in January 2007 for poor performance but rehired him in May 2007 when he needed additional staffing after opening Don't Know.  (Exh. 7; Zink Aff. ¶ 27). Mr. Emar denies being fired in January 2007 and not working from January 2007 through May 2007.  (Exh. 5; pgs. 34-35).

In addition, the documents used by Plaintiff Garrison (Doc. 45-1, Exh. 8) are not authenticated nor is there a proper foundation set forth in the documents in order for them to be potentially used as evidence for damage calculations.  Moreover, there is no reason to be credit the summary – particularly given the fact that Ms. Garrison admits that she received cash in addition to her paycheck from the Defendants.  Having been unable to testify as to her damages,

the Plaintiffs cannot just drop this evidence into the record.  Given the format of the documents, and the lack of authenticity and foundation, it is literally worth less than a sham affidavit.

> **v.      The Court Finds An FLSA Violation, It Should Limit Liquidated Damages.**

The Plaintiffs seek Summary Judgment on the issue of liquidated damages, and Defendants oppose such a grant.  Assuming arguendo that the Court finds an FLSA violation in this case, the Court has the discretion to reduce the amount of the liquidated damage upon a showing of good faith.  29 U.S.C. § 260.

While it is frequently held that a grant of liquidated damages is the "norm," this case is anything but normal.  This case is a hyper-technical case involving the FLSA, which appears to be an issue of first impression, involving an employer who only recently crossed the FLSA's coverage threshold (with respect to Don't Know).  There is no evidence of willfulness.  Imposing full liquidated damages will enrich the Plaintiffs and unfairly punish the Defendants, as Mr. Zink is a young struggling entrepreneur who has created jobs in Baltimore.

Doubling the damages in this case would provide a windfall, in light of the fact that there is scare authority for the Plaintiffs' legal position.  Their reliance on district court cases from New York demonstrates the difficulty a small Maryland employer might have to understand its obligations under the FLSA.  It is reasonable to assume that if an owner is a bartender interacting with customers and receiving tips like any other bartender, that he could participate in the tip pool.  Therefore, assuming that there is any violation of the FLSA in this case in the first instance, the Defendants respectfully request that the Court either issue no liquidated damages or that the Court issue a lesser amount in light of the totality of the circumstances.  See Bowman v. Harford County, 684 F.Supp. 416, 419-20 (D. Md. 1988) (granting liquidated damages in the amount of pre-judgment interest, because :County's

miscalculation arose from an innocent error, rather than from any intent to violate the law or from any plainly mistaken interpretation of law," and the "County had practically no experience with the FLSA," which had only recently begun applying to it by virtue of recent Supreme Court case law).

## IV.    Conclusion

This case is a case of first impression which is critically important to "Mom and Pop" restaurants and bars.  Tip pools represent an orderly way for restaurants and bars to operate, and it may serve to spread out the income for tipped employees (reduce the effect of a single bad tip on a tipped employee).   The Defendants strongly urge this Court to arrive at its own legal conclusions regarding management's participation in a tip pool under the FLSA, rather than adopt uncritically the views of a handful of other District Courts not faced with the precise issues in this case and analysis posited by Defendants.

As demonstrated above, all claims may be dismissed with prejudice.

Respectfully submitted,


_____/s/_____
Howard B. Hoffman, Esq.
Attorney at Law
600 Jefferson Plaza, Suite 304
Rockville, Maryland 20852
(301) 251-3752
(301) 251-3753 - fax

November 15, 2010

**REQUEST FOR ORAL ARGUMENT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November, 2010, a copy of the foregoing Defendants' Memorandum in Support of Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment, along with all Exhibits and other attachments, was filed via the Electronic Case Filing System (ECF) maintained by the U.S. District Court for the District of Maryland, and is available for viewing and downloading from the ECF system.


_____/s/_____
Howard B. Hoffman